■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent-Appellant, v RALPH ALLINI and RALPH URRITIA, Appellants-Respondents.—Appeals by defendants Ralph Allini and Ralph Urritia from two judgments of the Supreme Court, Kings County (one as to each of them), both rendered July 22, 1976, convicting them of reckless endangerment in the first degree and possession of weapons, etc., as a misdemeanor, upon a jury verdict, and imposing sentence. The People appeal from so much of an order of the same court, dated June 14, 1976, as set aside jury verdicts of guilty as against both defendants of attempted murder (three counts) and assault in the first degree (three counts). Judgments reversed and order reversed insofar as appealed from on the law and as a matter of discretion in the interest of justice, and new trial ordered as to the entire indictment. As a result of the wounding of three named persons on the evening of June 27, 1973 during a large-scale confrontation between two ethnic groups, Ralph Allini and Ralph Urritia were charged in an eight-count indictment (filed on October 26, 1973) with the following crimes: (1) attempted murder of Jose Colon, with a loaded rifle; (2) assault in the first degree of Jose Colon, with a loaded rifle; (3) attempted murder of Reginald Owen, with a loaded rifle; (4) assault in the first degree of Reginald Owen, with a loaded rifle; (5) attempted murder of Carlos Medina, with a loaded rifle; (6) assault in the first degree of Carlos Medina, with a loaded rifle; (7) reckless endangerment in the first degree, with a loaded rifle; and (8) possession of weapons and dangerous instruments and appliances (a rifle) as a misdemeanor. The counts of attempted murder were predicated upon a theory of a specific intent to murder, rather than upon a theory of recklessness. The first degree assault charges were likewise predicated upon a specific intent theory rather than a theory of reckless-ness.* Thus, the first count, which was typical of the other counts alleging intent, charged: "The Grand Jury of the County of Kings, by this indict-ment, accuse the defendants of the crime of ATTEMPTED MURDER, committed as follows: The defendants, each aiding the other and being actually present, on or about June 27, 1973, in the County of Kings, with intent to cause the death of JOSE COLON, attempted to cause the death of JOSE COLON by means of a deadly weapon, to wit: a loaded rifle, thereby inflicting divers wounds and injuries upon JOSE COLON." The trial commenced on March 9, 1976. Defendants were represented by the same trial attorney. At the close of the entire case, the court reserved decision on a defense motion for "a directed verdict of acquittal" and for dismissal of each count of the indictment. (See CPL 290.10, entitled "Trial order of dismissal".) On March 24, 1976 the jury

* As in effect on June 27, 1973, the Penal Law provided: "§ 125.25 Murder. A person is guilty of murder when: 1. With intent to cause the death of another person, he causes the death of such person or of a third person * * * 2. Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person". "§ 120.10 Assault in the first degree. A person is guilty of assault in the first degree when: 1. With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or * * * 3. Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person".

returned a verdict of guilty against each defendant on all eight counts of the indictment. The defense renewed its motion for a directed verdict of acquittal and also moved to set aside the guilty verdicts as contrary to law and contrary to the weight of the evidence, arguing that guilt was not proved beyond a reasonable doubt. The Trial Judge reserved decision; on May 21, 1976 he rendered an oral decision in open court setting aside the guilty verdicts as to the three counts of attempted murder and the three counts of assault in the first degree, and dismissing the said counts on the ground that the People had failed to prove beyond a reasonable doubt the requisite specific intent to kill (or seriously injure) the named individuals. The court refused to set aside the verdicts as to the seventh count (reckless endangerment in the first degree) and eighth count (possession of weapons, etc.). The Trial Judge's comments indicate that he was of the opinion that the People had indicted defendants under the wrong subdivision of the murder statute: "It is the Court's feeling in the matter that in order for a defendant to be convicted under this count of the indictment there must be a specific intent to kill a specific person, or attempt to murder a specific person. And, in this case, after reading the first count, it would appear that the District Attorney would have to prove the defendants guilty beyond a reasonable doubt that they intended to cause the death of Jose Colon, because he is mentioned specifically in the indictment as the person for whom the intention was referred to. * * * It is interesting to note that section 125.25 of the Penal Law also includes the second subdivision which subdivision reads 'Under circumstances evincing a depraved indifference to human life he recklessly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person'." On June 14, 1976 an order was signed on the above decision, and it is from the branch of the order which sets aside the verdicts as to six counts of the indictment that the People cross-appeal. Defendants have appealed from the judgments rendered July 22, 1976 convicting and sentencing them on the two counts *not* set aside, viz., reckless endangerment in the first degree and possession of weapons, etc., as a misdemeanor. In our opinion, the evidence was sufficient to establish beyond a reasonable doubt the guilt of each defendant with respect to each of the eight counts of the indictment. Accordingly, it was error for the Trial Judge to have set aside the guilty verdicts on the three attempted murder and three assault in the first degree counts. The following summary of the principal testimony shows that the jury verdicts were fully supported by the evidence and should not have been set aside. It *also* shows, however, that there was a possible conflict in the interests of the defendants—who were represented by the same trial attorney—and that for the reasons stated at the conclusion of our decision, rather than reinstatement of the verdicts and affirmance of a judgment of conviction on all eight counts, there must be a new trial as to the entire indictment. The evidence presented to the jury was as follows: On the evening of June 27, 1973, in the area of Fifth Avenue and Union Street, Brooklyn, New York, there was a large-scale riotous confrontation between "Italian" and "Hispanic" groups. The disorders spilled over onto nearby streets. The police aligned themselves along the middle of Union Street to separate the "Hispanics" to the north (Lincoln and Berkeley Places) and the "Italians" to the south (President Street). Jose Roman testified that he and two friends went to the roof of 238 Fifth Avenue; he was looking towards Union Street and Lincoln and Berkeley Places with binoculars, "looking at the riots"; about 15 to 20 minutes later defendants came onto the roof and Allini told Roman and his friends to "get out of here." Roman testified that as he and his friends were

about to go down the skylight, he observed Allini take a rifle from a shopping bag he was carrying and point it towards Union Street; "he took it out and he pointed down", at which time Allini's companion (codefendant Urritia) told Allini to "hurry up before they come." At about 10:00 P.M. Jose Colon, while at the corner of Union Street and Fifth Avenue, and facing President Street, was shot in the neck by a bullet which penetrated his vertebrae and left him totally paralyzed from the shoulders down. The bullet that struck him was not recovered. That evening Reginald Owen crossed Fifth Avenue and stopped between Lincoln and Berkeley Places to see what was going on. Upon facing President Street he was shot in the leg. On the same evening Carlos Medina, while standing on the corner of Lincoln Place and Fifth Avenue, looking towards Union Street, at about 10:00 P.M., was shot in his arm. Julio Pabon testified that on the night in issue he lived on the first floor at 238 Fifth Avenue. In the course of the evening defendant "Ralphie" Allini (who the witness had known for six or seven years) knocked on his door and "he told me that the police were after him, to please let him in my apartment." The witness did not let Allini in; he opened the door and closed it right away. Pabon did not see whether Allini was holding anything or was with anyone. Jose Roman also testified to the effect that after being chased from the roof by defendant Allini, he and his companions, Alberto Aponte and Elgardo Pabon, ultimately went to the apartment of Julio Pabon. About 10 to 15 minutes after having seen Allini and Urritia on the roof, Roman heard Allini knock on Julio Pabon's door and saw and heard Allini refused admittance by Pabon. Roman added that a woman named Dotty (Wildes) lived across the hall and, after Julio Pabon had shut the door on Allini, Roman heard some other knocks (on the Wildes' door) but didn't see anything—Julio Pabon's door was then locked. Dorothy Wildes testified that at the time in issue she lived at 238 Fifth Avenue, Brooklyn, a six-family building located at President Street and Fifth Avenue. She had lived there for about 15 years and had known Allini and Urritia for 2 to 3 years; they were acquaintances of her son. On the night in question, she had visited the hospital because her son and son-in-law, who had been shot that night "about nine thirty, maybe ten or ten thirty, I don't know", were there. She returned to her apartment about "ten or ten thirty that night, maybe later", "about twenty five to or twenty to eleven". There was a knock on the door "only a matter of minutes" after she had entered. She opened the door and saw defendant Ralph Urritia, who she knew as "Ralphy Bop". She saw no one else there, "only policemen coming up and down." Urritia handed her a rifle and told her he would be right back. She put it in her hallway, went back to the window and heard that someone had been shot. "I panicked. And I took it and put it out on the fire escape". There were no other rifles there. Late in the morning, police officers came to her apartment, went to the fire escape, found the rifle and took it. On cross-examination, she stated that after she had placed the rifle on the fire escape, and prior to the police coming to her apartment and recovering it, there had been police going up and down the fire escape. She testified "I can't swear" that the rifle they retrieved was the same one she had put there. Roman testified that after Julio Pabon turned Allini away, he went to the window of Pabon's first-floor apartment, looked out down President Street, and a few minutes later saw Allini and Urritia come down in front of 238 Fifth Avenue, cross the street and go up Carroll Street. Detective Daniel Boldi testified that at approximately 12:40 A.M. on June 28, 1973, he went to the roofs of 234 Fifth Avenue and 650 President Street, which are adjoining buildings. (In addition, 650 President Street adjoins

about two or three other buildings.) Boldi observed six .22 caliber spent casings and "one telescope mounting bracket", all on the roof of 650 President Street. He observed a seventh shell casing on the roof of 234 Fifth Avenue. Although the bullet in Owen's body was never removed, and the bullet fragment removed from Medina's arm was too marred for a comparison test, the medical examiner testified (from X rays) to the effect that the respective bullets that had entered the bodies of Colon, Medina and Owen were .22 caliber bullets. Photographs taken by Police Officer Lionel Payne were placed in evidence. They showed, *inter alia,* that the rooftop of 650 President Street overlooked the places where the victims, Colon, Medina and Owen, had been shot. Detective Alfred Johnson testified that he performed a comparison test of the rifle seized on the fire escape with the seven .22 caliber spent casings and concluded that the casings had come from that weapon. He also testified that the rifle, a .22 caliber, single-shot, lever action, had a firing range of one mile and could penetrate human flesh within one-half mile. Patrolman Gerard Gunn measured the alleged target distances. They were all within the weapon's firing range for human penetration. Policewoman Terese Cavanaugh testified that from the police telephone switchboard log, she determined that there had been four separate reports of shooting incidents at that general location during the hours of 10:10 P.M. and 11:52 P.M. The only witness called by the defense was Vincent Marino, a civil engineer. He calculated that, with regard to the shooting of Jose Colon, the firing point must have been 78 feet higher than the measured height of the roof of 650 President Street because the bullet entered his neck on a 20° downward angle. On cross-examination he admitted that his computation was based upon the assumption that Colon stood erect before the bullet's impact. A downward lean of the neck just before impact would change the figures. In the light of the above, we find there was ample evidence of the specific intent required by subdivision 1 of section 120.10 and former subdivision 1 of section 125.25 of the Penal Law. The jury could readily have found that (1) Allini—directly aided and abetted by Urritia—aimed and fired the rifle, intending the natural and probable consequences of that act (viz., that the bullets enter and kill Colon, Medina and Owen), and (2) the bullets fired by Allini did, in fact, enter the bodies of Colon, Medina and Owen. Accordingly, we would reinstate the verdicts set aside by the Trial Judge and affirm the conviction of both defendants as to all eight counts, were it not for the fact that a careful review of the evidence and the roles of each defendant establishes—in addition to the fact that the evidence was sufficient to warrant the guilty verdicts on each of the eight counts—that there was an incipient conflict in the interests of each of the defendants as against the other. As was stated in *People v Gomberg* (38 NY2d 307, 313-314): "The court should also recognize that a defendant may not always perceive the existence of a conflict of interest in the joint representation by an attorney. Consequently, the court should be satisifed, where there is joint representation, that the defendant's decision to proceed with his attorney is an informed decision. *(United States v Truglio,* 493 F2d 574, 579; *United States v Williams,* 429 F2d 158, 161, cert den 400 US 947; *United States v Lovano,* 420 F2d 769, 772-773, cert den 397 US 1071; *Campbell v United States,* 352 F2d 359, 360; ABA Standards Relating to the Function of the Trial Judge, § 3.4; see *People v Chacon,* 69 Cal 2d 765.) The court may even inquire as to whether counsel himself has perceived the conflict and apprised his client of the risks involved. (See *Lord v District of Columbia,* 235 A2d 322, 323 [DC].) However, a court must be careful not to pursue its inquiry too far as it may infringe upon the defendant's right to

retain and confer with counsel of his own choice. (See *People v Gonzalez,* 30 NY2d 28, 34, *supra.)* Of course, the court ordinarily should not probe, as part of its inquiry, into confidential attorney-client communications, including discussions of possible defenses of both the accused and his codefendants. Moreover, to permit an extensive judicial inquiry into privileged matter would 'virtually * * * outlaw joint representation'. *(United States v Wisniewski,* 478 F2d 274, 285.) What is required is that when two or more defendants are represented by the same attorney, the trial court ascertain, on the record, whether each defendant has an awareness of the potential risks involved in that course and has knowingly chosen it. (See *United States v Wisniewski,* 478 F2d 274, 285, *supra; Glasser v United States,* 315 US 60, 71, *supra.)*" The inquiry suggested by *Gomberg* was not held in this case and, therefore, as candidly conceded by the People, there must be a new trial. For the reasons heretofore stated, the new trial must be on all eight counts of the indictment. We are aware of the holding of *People v Brown* (40 NY2d 381, cert den 433 US 913) with respect to the right of the People to appeal from a trial order of dismissal. We hold, however, that *Brown* presents no double jeopardy impediment to our disposition. In setting aside the convictions of the three counts of attempted murder and the three counts of assault in the first degree, the Trial Judge was acting on (1) a defense motion to set aside those verdicts as contrary to law, contrary to the weight of the evidence and on the further ground that guilt was not proven beyond a reasonable doubt, and (2) defense motions on which he had reserved decision during trial and prior to the submission of the case to the jury. To the extent that the People's appeal may be deemed an appeal from a trial order of dismissal, *Brown* permits such an appeal where reversal would result merely in a reinstatement of the verdicts which had been set aside by the Trial Judge on a reserved motion. That being the case, these defendants cannot be heard to complain if this court, which under *Brown,* has the right to reinstate the vacated verdicts, goes further and *benefits* them by ordering a *new trial* thereon, based on their argument (and the People's concession) that their representation by the same trial counsel, and the failure of the court to give the requisite warning of the possible pitfalls of such joint representation, mandates a new trial as to their convictions of reckless endangerment and possession of weapons (see *People v Gomberg,* 38 NY2d 307, *supra).* Although defendants' *Gomberg* argument was raised in support of their appeal from the judgment rendered on the two counts *not* set aside, that defect necessarily spilled over to, and permeated, the trial of the attempted murder and assault in the first degree counts. We have examined the defendants' other contentions and find them to be without merit. Mollen, P. J., Titone, Rabin and Margett, JJ., concur.